UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HENRY LLOYD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:19-cv-04920-JPH-MJD |
| | ) |
| DR. BRUCE IPPEL, | ) |
| | ) |
| Defendant. | ) |

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Henry Lloyd is suing a prison doctor for deliberate indifference to a serious medical need. He claims that the defendant, family practice physician Bruce Ippel, ripped a scab off his recently amputated leg, cut into his infected stump without anesthesia, and kept cutting while Mr. Lloyd screamed and cried and begged him to stop. Dr. Ippel does not deny these allegations.

Dr. Ippel has moved for summary judgment. He argues that he provided adequate treatment to Mr. Lloyd for over two years and faults Mr. Lloyd's unruly behavior for complicating his medical care. He does not address the allegations at the heart of Mr. Lloyd's complaint—that Dr. Ippel attempted a surgical procedure without anesthesia, that the procedure was beyond his qualifications as a family practice physician, and that he kept cutting even though he knew he was causing Mr. Lloyd extreme pain. Nor does he explain why he delayed prescribing an antibiotic and submitting an outpatient surgical request after observing the rapid advance of infection and necrosis in Mr. Lloyd's stump.

A reasonable jury could find from the designated evidence that Dr. Ippel was deliberately indifferent to Mr. Lloyd's serious medical need, so the motion for summary judgment must be **DENIED**.

## I. SUMMARY JUDGMENT STANDARD

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Cmty. Schools*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

## II. BACKGROUND

Mr. Lloyd is 62 years old. Dkt. 38-3, p. 3. He has been a prisoner of the Indiana Department of Correction for most of his adult life. *Id.* at 4. He has many chronic medical conditions, including diabetes, heart disease, hypertension,

kidney failure, and asthma. Dkt. 38-2, para. 4. Mr. Lloyd has had multiple surgeries on his right leg, including amputation of a toe, then amputation of the leg below the knee, and then "stump revision surgery." *Id.* at paras. 5, 17-18, 31.

Bruce Ippel is a physician who at all times relevant to this case was employed by Wexford of Indiana as the Medical Director at the New Castle Correctional Facility in New Castle, Indiana. Dkt. 38-2 at 1, ¶¶ 1-2. Dr. Ippel treated Mr. Lloyd on numerous occasions. *Id.* at ¶ 3.

### A. First Amputation

Mr. Lloyd's right big toe was amputated in March 2017. Dkt. 38-1, pp. 91-93; dkt. 38-2, paras. 5-6; dkt. 38-3, pp. 3-4. After the amputation, he was transferred to the infirmary at New Castle, where he was treated by Dr. Ippel. Dkt. 38-1, pp. 91-93; dkt. 38-2, para. 6; dkt. 38-3, pp. 3-4, 13.

Mr. Lloyd was discharged from the New Castle infirmary in April 2017. Dkt. 38-1, pp. 91-93. Three days later, he saw Dr. Ippel and reported pain in his right foot and calf, suggesting that he had another deep tissue infection. *Id.* at 89. Dr. Ippel prescribed a two-week course of an oral antibiotic (amoxicillin). *Id.* at 85.

Over the next few months, Mr. Lloyd developed ulcers, infections, tissue death, and pain in his right foot and leg. *Id.* at 57-86. Dr. Ippel approved offsite visits for imaging and surgical consults. Dkt. 38-2, paras. 7-8, 11. Mr. Lloyd was readmitted to the infirmary on May 15. *Id.* at para. 10.

In June, an orthopedic surgeon recommended a right leg amputation below the knee. *Id.* at 12; dkt. 38-1, pp. 57-59. Five days later, Mr. Lloyd was put on an intravenous antibiotic for one month. Dkt. 38-1, p. 55-56. His second amputation was delayed because his cardiologist was concerned that preexisting vascular issues could prevent an amputation below the knee from healing properly. *Id.* at pp. 44, 47-48.

In September 2017, Dr. Ippel submitted an outpatient request for a surgical consult. *Id.* at 36-39. A vascular study to assess the safety of the amputation was scheduled for the end of the month. *Id.*

### B. Second Amputation

Mr. Lloyd's right leg was amputated below the knee on November 7, 2017. Dkt. 38-2, para. 9. He was released to the New Castle infirmary three days later. *Id.* He received a topical antibiotic cream (bacitracin) through December 24 and an oral antibiotic (ciprofloxacin) from November 19 to November 29. Dkt. 38-1, p. 30, 32.

Two weeks later, Dr. Ippel observed dry necrosis at the site of the amputation. Dkt. 38-1, p. 28; dkt. 38-2, para. 19.[1] He also observed dark discoloration and drainage. *Id.* There were no open areas. *Id.* Dr. Ippel removed Mr. Lloyd's sutures and ordered that he be weaned off morphine. *Id.*

---

[1] Dry necrosis occurs when tissue dies from a lack of blood supply. Wet necrosis occurs when bacteria invade the tissue. This makes the area swell, drain fluid, and smell bad. *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/gangrene (last visited March 9, 2022).

Five days later, Mr. Lloyd told Dr. Ippel that he still had substantial pain at the site of the amputation. Dkt. 38-1, p. 25; dkt. 38-2, para. 20. His surgical flap had some areas of inadequate blood supply and necrosis. *Id.*

The next week, Dr. Ippel observed "blackish discoloration" at the site of the amputation. Dkt. 38-1, p. 17. Dr. Ippel believed that some areas of the flap "may be necrotic" but that some discoloration appeared to be blood that was slowly draining following the amputation. *Id.*

On December 9, Mr. Lloyd was removed from the infirmary. Dkt. 38-2, para. 22. From December 12 to December 27, he was hospitalized after telling Dr. Ippel that he had shortness of breath and some coughing. *Id.* at para. 23; dkt. 38-1, p. 12. He suffered heart and kidney failure at the hospital. Dkt. 38-2, para. 24. He was released to the New Castle infirmary. Dkt. 38-1, p. 5.

On December 28, Dr. Ippel observed a large scab at the amputation site. *Id.* On January 2, the scab was still there, and Dr. Ippel observed drainage at the amputation site. *Id.* at p. 185.

On January 16, Mr. Lloyd was removed from the infirmary and sent to segregation for "ongoing negative behavior toward the nursing staff." Dkt. 38-2, para. 27. Mr. Lloyd denies that he was removed for behavioral issues and states that he wanted to be removed because he was able to receive the same treatment in the general prison population. Dkt. 38-3, p. 11, 16.

Toward the end of January 2018, Mr. Lloyd's condition got worse. His stump became infected and emitted the stench of wet necrosis. Dkt. 38-1, pp. 177-78 (January 31 appointment); dkt. 38-3, pp. 16. Dr. Ippel prescribed an

antibiotic (cephalexin) on February 8. Dkt. 38-1, p. 168. The medical records show that this prescription was supposed to last for two weeks, but Mr. Lloyd testified that he only received antibiotics for a few days. *Id.*; dkt. 38-3, p. 9.

Dr. Ippel performed a surgical procedure on Mr. Lloyd's stump in a medical exam room. Dkt. 38-1, pp. 173-75; dkt. 38-3, p. 17. He did not use anesthesia or a numbing agent. Dkt. 38-3, p. 17. Mr. Lloyd testified: "[Dr. Ippel] didn't numb my scab and peel it off. He just ripped it off and started cutting with a scalpel talking about he's debriding it. And I was crying and complaining of pain, and you know, he just still kept cutting me." *Id.* at 16. Dr. Ippel ignored Mr. Lloyd's request that a leg surgeon perform this procedure. *Id.* at 8.[2]

After the procedure was over, a nurse bandaged Mr. Lloyd's stump and cleaned the blood off of his chair. *Id.* at 17. His stump was still bleeding a few days later when he finally saw a leg surgeon. *Id.*

Dr. Ippel does not explain why he attempted this surgical procedure. He does not state that his training as a family practice physician qualified him to attempt this surgical procedure or that attempting the procedure was a matter of professional judgment. Indeed, Dr. Ippel's affidavit does not mention the procedure or deny that the procedure occurred. *See generally* dkt. 38-2.

Regarding the appointment on January 31, Dr. Ippel wrote: "Since returning from his hospital stay, Plaintiff's surgical flap had been nonviable. It was managed onsite in the infirmary but failed to granulate and rather had a

---

[2] The exact date of this procedure is not clear, but it was sometime between January 31 and February 13. *See* dkt. 43, pp. 6-7 (response brief) (citing Dr. Ippel's affidavit and Mr. Lloyd's medical records and deposition).

necrotic center of unknown extent. I believed the wound may require additional surgical intervention or wound management, and I submitted the outpatient request for a consult and additional advice." Dkt. 38-2 at 8-9, ¶ 28.

Mr. Lloyd's medical records show that the outpatient request was not submitted until February 13. *Id.* at 173-76. Dr. Ippel has not explained this delay or explained why he waited until February 8 to prescribe an antibiotic. *See generally* dkt. 38-2.

### C. Third Amputation

Mr. Lloyd's third amputation occurred sometime between February 19 and February 28. Dkt. 38-2, paras. 30-31. The surgeon removed an additional six inches of his right leg below the knee. Dkt. 38-3, p. 9. Mr. Lloyd's right leg now stops three inches below the knee. *Id.* at 15. Mr. Lloyd continued to receive treatment from Dr. Ippel through July 2019. Dkt. 38-2, paras. 31-49.

### D. Procedural History

In this case, Mr. Lloyd alleges that Dr. Ippel attempted to surgically remove infected and necrotic tissue from the stump of Mr. Lloyd's right leg after his second amputation procedure, and then delayed prescribing antibiotics and submitting an outpatient surgical request when the advanced necrosis became critical. *See* dkt. 1 (complaint); dkt. 10 (screening order). The infection and necrosis required Mr. Lloyd to undergo a third amputation three inches below his right knee. *Id.*; dkt. 38-3, p. 15.

In its screening order, the Court summarized the facts supporting the claims that were allowed to proceed:

7

> The complaint alleges that Dr. Eppel pulled a scab off Mr. Lloyd's freshly amputated leg and began cutting the leg with a scalpel, severing nerves and causing significant blood loss. This procedure caused a severe infection, and a surgeon had to amputate an additional six inches of Mr. Lloyd's leg, which is still infected. Wexford has allegedly denied Mr. Lloyd necessary physical therapy and provided him with a wheelchair that is too small.

Dkt. 10 at 2.

### III. DISCUSSION

To prevail, Mr. Lloyd must prove that he had an objectively serious medical condition and that Dr. Ippel was deliberately indifferent to that condition. *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). Dr. Ippel concedes that Mr. Lloyd's infected and necrotic stump was objectively serious. Dkt. 37, p. 24. The issue is whether a reasonable factfinder could conclude that Dr. Ippel was deliberately indifferent.

#### A. Deliberate Indifference

Prisoners bringing medical claims under the Eighth Amendment face a high bar. "While evidence of medical malpractice often forms the basis of a deliberate indifference claim, the Supreme Court has determined that plaintiffs must show more than mere evidence of malpractice to prove deliberate indifference." *Petties*, 836 F.3d at 728 (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). The plaintiff must show the defendant "did not just slip up, but was aware of, and disregarded, a substantial risk of harm." *Petties*, 836 F.3d at 728.

"To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment."

8

*Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Plummer v. Wexford Health Sources, Inc.*, 609 F. App'x 861, 862 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation omitted). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

### B. Analysis

Dr. Ippel argues that he provided medical treatment to Mr. Lloyd for a little over two years. He outlines the care he provided for his various chronic conditions, including the persistent infection and necrosis of his right leg, and argues that his treatment decisions are entitled to deference under the professional judgment standard. Dkt. 37, p. 30 (citing *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)).

Dr. Ippel's argument does not address Mr. Lloyd's core allegations, that is, the treatment Mr. Lloyd received for the infection and necrosis in the stump of his right leg after his second amputation. Dkts. 1, 10. Viewed in the light most favorable to Mr. Lloyd, the evidence shows that Dr. Ippel waited eight days to

prescribe an antibiotic after he observed advancing infection and necrosis. Dkt. 38-1, pp. 168. He also waited thirteen days to submit an outpatient request for a surgical consult. *Id.* at 173-79. Regardless, a jury could reasonably find that Dr. Ippel performed a surgical procedure on Mr. Lloyd's infected and necrotic stump over Mr. Lloyd's objection, did not use anesthesia or a numbing agent, and kept cutting into the stump as Mr. Lloyd cried and screamed in pain. Dkt. 38-3, pp. 8, 16-17.

Dr. Ippel does not explain—or even address—these treatment decisions. The closest he comes is an unclear statement in his brief that may refer to the visit when Dr. Ippel removed the scab and began cutting: "Since returning from his hospital stay, Plaintiff's surgical flap had been nonviable. It was managed onsite in the infirmary but failed to granulate and rather had a necrotic center of an unknown extent." Dkt. 37 at 10, ¶ 27.

A reasonable factfinder could conclude that Dr. Ippel's performance of a painful surgical procedure in an exam room with no anesthesia or numbing agent while Mr. Lloyd screamed and cried and begged him to stop amounted to an "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105. A reasonable factfinder could also conclude that his decision to perform this procedure, his delay in prescribing an antibiotic, and his delay in submitting an outpatient surgical request unnecessarily prolonged Mr. Lloyd's pain. *See Lewis v. McLean,* 864 F.3d 556, 563 (7th Cir. 2017) ("A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain"; "even brief,

unexplained delays in treatment may constitute deliberate indifference.") (emphasis removed) *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain).

Dr. Ippel faults Mr. Lloyd's unruly behavior for complicating his care and causing him to be removed from the infirmary. Dkt. 27-28. Mr. Lloyd disputes this characterization and argues that he was just alerting the medical staff to his worsening condition in the face of inadequate care. Dkt. 43, pp. 11-12. For summary judgment purposes, this is not a material dispute. Dr. Ippel says that because of his unruly conduct, Mr. Lloyd "had to be placed in segregation into the assisted living unit *where he would continue to receive regular medical treatment.*" Dkt. 37, p. 28 (emphasis added). Dr. Ippel cannot argue in one breath that Mr. Lloyd's care was compromised by his unruly behavior, and in the next claim that his removal from the infirmary had no effect on his treatment. Further, Mr. Lloyd's unruly behavior does not explain why Dr. Ippel attempted to perform surgery without anesthesia or why he delayed prescribing an antibiotic and submitting an outpatient surgical request after observing the advanced infection and necrosis.

There are factual disputes precluding summary judgment, and the motion for summary judgment is **DENIED**.

\* \* \*

The core of Mr. Lloyd's Eighth Amendment claim is that Dr. Ippel performed a painful surgical procedure on Mr. Lloyd's wound, over Mr. Lloyd's objection and without anesthesia or a numbing agent. After approximately a year of litigation, Dr. Ippel sought summary judgment citing a host of facts and arguments. But he didn't address Mr. Lloyd's core allegation or the evidence in support of it. Instead, he argued that Mr. Lloyd "was seen and treated on many occasions" and was "provided regular medical attention and treatment to address [his] complaints and concerns." Dkt. 37 at 23-24. Advancing these arguments while ignoring Mr. Lloyd's principal allegation and the corresponding facts in the record was contrary to the "principal purpose of the summary judgment rule, which is 'to isolate and dispose of *factually unsupported* claims or defenses.'" *Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir. 1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). Accordingly, the Court **ORDERS** Dr. Ippel to **SHOW CAUSE by April 29, 2022** why the Court should not impose sanctions for bringing a frivolous motion and abuse of the judicial process. *See Fuery v. City of Chicago,* 900 F.3d 450, 463 (7th Cir. 2018).

## IV. CONCLUSION

The motion for summary judgment, dkt. [36], is **DENIED**, and Defendant is ordered to **SHOW CAUSE** why the Court should not impose sanctions. The Magistrate Judge is requested to schedule a settlement conference.

**SO ORDERED**.

12

Date: 3/29/2022

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

HENRY LLOYD
866281
PLAINFIELD - CF
PLAINFIELD CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Rachel D. Johnson
KATZ  KORIN CUNNINGHAM, P.C.
rjohnson@kkclegal.com

Mark Wohlford
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
mwohlford@boselaw.com